# FIFTH DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

Case No. 5D2023-0449
LT Case No. 16-2020-DR-3958-FM

_____

JORGE CONDE-BERROCAL,

    Appellant/Cross-Appellee,

    v.

JENNIFER F. CONDE,

    Appellee/Cross-Appellant.

_____

On appeal from the Circuit Court for Duval County.
Lance M. Day, Judge.

Michael G. Tanner and Megan K. Moon, of Gunster, Yoakley & Stewart, P.A., Jacksonville, for Appellant/Cross-Appellee.

Lawrence C. Datz, of Datz & Datz, P.A., Jacksonville, for Appellee/Cross-Appellant.


June 21, 2024

MAKAR, J.

    This marital dissolution case, along with a related case,[1] involves the calculation of personal goodwill in the same multi-

_____

[1] *Rosenberg v. Rosenberg*, No. 5D2023-1079, 2024 WL ___, at __ (Fla. 5th DCA June 21, 2024).

member medical practice, North Florida Anesthesia Consultants ("NFAC") in Jacksonville. In this case, the former husband, Jorge Conde-Berrocal, claims that the trial court erred by accepting the personal goodwill and lost future income calculations of the expert of his former wife, Dr. Jennifer Conde. Also at issue is an award of attorney's fees to the former husband. We affirm as to all other issues, limiting our discussion to only the personal goodwill and attorney's fees issues.

I.

After fifteen years of marriage, Jorge filed for dissolution of marriage in July 2020. At that time, Jennifer was an anesthesiologist at NFAC; Jorge was self-employed as CEO of his company, V3.

As recounted in *Rosenberg*, the physician-shareholders of NFAC, including Jennifer, sold their medical practice in April 2016 to Sheridan Healthcorp, Inc. ("Sheridan") for a total payout of $99,450,000. This amount was divided among the physician-shareholders, each receiving approximately $2,650,000. In addition, the physician-shareholders were required to agree to work for NFAC for five years and to sign a noncompete agreement for which they were each paid $25,000 ("Restrictive Covenant Payment"). Jennifer deposited the buyout funds into a joint brokerage account; the amount after taxes was $2,643,566.

Both parties presented experts to determine whether any of Jennifer's NFAC sale proceeds was non-marital personal goodwill or payment for loss of future income. As was said in *Rosenberg*:

> Personal goodwill is value attributable to the reputation and skill of the physician-shareholders in providing medical services to their patients; in contrast, enterprise goodwill is value from ongoing referrals to and patronage of the medical practice that is separate and apart from personal goodwill. Under established Florida law, the personal goodwill of a medical practitioner in a *solo* practice is not a marital asset.

2

*Rosenberg v. Rosenberg*, No. 5D2023-1079, 2024 WL ___, at __ (Fla. 5th DCA June 21, 2024) (citing *Thompson v. Thompson*, 576 So. 2d 267, 268 (Fla. 1991)). In *Rosenberg*, we concluded that the personal goodwill of all medical practitioners in a multi-member practice such as NFAC is non-marital and not to be considered in a marital dissolution case. The issue is different here: Jorge does not claim an entitlement to a portion of the personal goodwill of other former NFAC physicians; instead, his claim is that error occurred in the award of a portion of the NFAC payment to Jennifer as non-marital goodwill or for lost future income.

In this regard, Jorge's expert, Josh Shilts, opined that $25,000 was the entirety of Jennifer's personal goodwill as that was the amount of the Restrictive Covenant Payment. Shilts saw no other indicators of personal goodwill or lost future income other than the presence of the non-compete agreement and the $25,000 payment.

Jennifer's expert, Charles Donald Wiggins, who had experience with similar transactions, opined that Jennifer had personal goodwill and lost future earnings above and beyond the $25,000 payment because large transactions of this type are often structured to allocate taxes in a favorable way. For example, the $25,000 was likely a "relatively small part" of the overall goodwill, and perhaps the "minimum amount possible," because the payment "would be treated as ordinary income" while the "sale of goodwill is treated as a capital gain" resulting in "a substantial difference in tax treatment."

Wiggins also indicated that physicians in the transaction agreed to reduce future income for a "lump sum payment upfront" representing future earnings. He opined that the lump sum paid to Jennifer represented both personal goodwill and lost future earnings and that they were non-marital and inseparable ("I'm not sure you can separate them"). At the time that Jorge had filed his petition, however, Jennifer had worked for fifty-one of the sixty months under her contract, leaving nine months of work post-petition. Wiggins estimated the amount of post-petition personal goodwill/reduced income as 15% of the lump sum payment (15% = 9/60, which is the number of post-petition months divided by the five-year [60 month] restrictive covenant). He added in monies

held in escrow for Jennifer, the sum totaling $408,159, an amount the trial judge—the same as in *Rosenberg*—assigned as non-marital in her favor.

## II.

## A.

On appeal, Jorge challenges the trial court's award of personal goodwill and lost future income. He argues that the only competent substantial evidence in support of personal goodwill was the $25,000 contractual payment for the five-year restrictive covenant. He says this payment reflects "how Sheridan, the buyer of the medical practice, valued [Jennifer's] continued participation." He also asserts that Wiggins's opinion as to personal goodwill and lost future income was speculative.

The burden was on Jennifer to establish that the NFAC funds, which were deposited into a joint account, or portions thereof, were non-marital. *See Yon v. Yon*, 286 So. 3d 322, 328 (Fla. 1st DCA 2019) ("Deposit of the funds does not necessarily make the entire account marital. The former husband may be able to meet his burden of proof to establish what portion of the account remains nonmarital.").

To begin, no one disputes that at least $25,000 of those funds are non-marital personal goodwill, as reflected in the Restrictive Covenant Payment. Jorge is correct that this amount is the only *explicit* value mentioned in the transaction that directly supports the existence of personal goodwill. The restrictive covenant itself, of course, is the strongest indicator of the existence of personal goodwill. *See Schmidt v. Schmidt*, 120 So. 3d 31, 33 (Fla. 4th DCA 2013) ("When valuing the enterprise goodwill of a business, the necessity of a covenant not to compete is significant as it signals the existence of personal goodwill . . . ."). But the restrictive covenant and the $25,000 payment don't end the story.

As recounted by Wiggins, this NFAC-Sheridan transaction was structured to have a minimal/nominal payment (here the $25,000) for personal goodwill, which is deemed ordinary income for tax purposes, while the bulk of the personal goodwill and lost

4

future income was contained in the NFAC payment itself, which is treated differently under a capital gains analysis. This distinction explains why the market value of the NFAC medical practice, which had essentially no physical assets, was predominately, if not exclusively, either personal goodwill or payment for lost future income, as Wiggins concluded in his analysis. Because personal goodwill and lost future income are so closely intertwined, and difficult or impossible to separate, it was not improper to conclude that the entire value of Jennifer's proceeds from the NFAC buyout was non-marital. *See Thompson*, 576 So. 2d at 270 ("Any value which attaches to the entity solely as a result of personal goodwill represents nothing more than probable future earning capacity, which, although relevant in determining alimony, is not a proper consideration in dividing marital property in a dissolution proceeding." (quoting *Taylor v. Taylor*, 386 N.W.2d 851, 858 (Neb. 1986))).

Next is the question of the validity of Wiggins's method. It is a close one, but we conclude that his allocation of 15% (9/60ths) of the value of the entire NFAC proceeds to Jennifer post-filing was a reasonable means of estimating a fair allocation under the circumstances. Wiggins admitted that methodologies, other than the one he used, exist; Shilts identified two that he deemed acceptable (neither used by Wiggins); and Shilts relied solely on the Restrictive Covenant Payment. But the question is whether the calculation in this specific case meets applicable standards under the facts presented. *See Thompson*, 576 So. 2d at 270 ("The determination of the existence and value of goodwill is a question of fact and should be made on a case-by-case basis with the assistance of expert testimony."). Though the method used was not analytically rigorous and involved a degree of professional judgment, it was not arbitrary to draw the line of division at the date the petition was filed, a typical marker in assigning marital/non-marital assets. The methodology is legally adequate under both *Thompson* and the competent substantial evidence test to establish an equitable apportionment. *See Palmer v. Palmer*, 316 So. 3d 411, 414 (Fla. 5th DCA 2021) (determining that the valuation of marital assets must be supported by competent substantial evidence).

We note that differences in methodologies, such as those in this case and *Rosenberg*, are permissible so long as the underlying foundation is based on a fair market value approach. *See Thompson*, 576 So. 2d at 270 (adopting this approach as "the exclusive method of measuring the goodwill of a professional association"). That said, "[p]rofessional goodwill and its components of 'personal' and 'enterprise' goodwill have been a quagmire for courts in dissolution of marriage proceedings. The reasons for its inclusion in or exclusion from the marital or communal estate can be as diverse as the different methods employed in valuing it." Christopher A. Tiso, *Present Positions on Professional Goodwill: More Focus or Simply More Hocus Pocus?*, 20 J. Am. Acad. Matrim. Laws. 51, 51 (2006). Comparing the methodologies in *Rosenberg* and this case proves this adage. In *Rosenberg*, a methodology was used to separate enterprise goodwill from the personal goodwill of the physicians, but neither expert in this case (including Jorge's expert, Shilts, who was an expert in *Rosenberg*) attempted to do so in like manner. In *Rosenberg*, Shilts agreed that that the entire value of the Sheridan transaction, $71,660,000, was goodwill, consisting of both enterprise goodwill and personal goodwill, estimating that the physician-spouse's personal goodwill was $2,544,000. Here, however, he took the position that the Restrictive Covenant Payment represented each physician's personal goodwill, concluding that Jennifer's personal goodwill was $25,000, a nearly 100-fold difference. Of course, Jennifer had fewer years of experience than did the physician-spouse in *Rosenberg*, but the difference is nonetheless startling. That's not to say the Wiggins's approach is without shortcomings; it's not perfect, but minimally acceptable.

## B.

On cross-appeal, Jennifer contests that she should have to pay 60% of the attorney's fees for Jorge's trial lawyers, an award of $44,417.07. She points out that (a) he paid for much of his attorney's fees before trial with joint marital funds; (b) he can pay his own attorney's fees given his almost $2 million from the equitable distribution of assets of which about $800,000 was liquid funds; and (c) he was awarded $10,000 monthly for a year as bridge-the-gap alimony. Jorge counters that Jennifer has far

greater income than him, that he had no actual income at the time of the final judgment (only imputed income), and that she received a greater proportion of the overall equitable distribution.

Our analysis is governed by principles set forth in *Lovell v. Lovell,* 14 So. 3d 1111 (Fla. 5th DCA 2009), which stated:

> One spouse does not have to "be completely unable to pay attorney's fees in order for the trial court to require the other spouse to pay [them]." On the other hand, this court has noted that attorney's fees should not be awarded when the spouse has "received assets via equitable distribution or alimony, or has another income source with which to pay the attorney fees without diminishing the party's standard of living or depleting that party's assets."

*Id.* at 1117 (alteration in original) (first quoting *Canakaris v. Canakaris*, 382 So. 2d 1197, 1205 (Fla. 1980); then quoting *Kelly v. Kelly,* 925 So. 2d 364, 368 (Fla. 5th DCA 2006)). Importantly, the "trial court should make its determination regarding attorney's fees 'after the dissolution proceeding has concluded, *based upon the financial situation in which it has left the parties.*'" *Lovell*, 14 So. 3d at 1117 (citation omitted) (emphasis added).

Here, it is apparent that Jorge has sufficient post-dissolution funds to pay his attorney's fees, including the portion the trial court ordered Jennifer to pay, the latter constituting about 5% of his *liquid* assets (or about 2.4% of his overall assets). The "financial situation" in which the trial court "left the parties" gave each substantial assets, both liquid and non-liquid. Jennifer is in a far better financial situation, but that is not the legal standard. In reversing an award of attorney's fees, this Court stated in *Lovell*:

> Here, the former wife has received sufficient assets as a result of the dissolution so that it cannot be said that there is a requirement for the former husband to pay this part of the former wife's attorney's fees. Given the asset distribution, it is clear that both parties had a

similar ability to secure competent legal counsel (and, parenthetically, did so). Accordingly, we conclude that the trial court abused its discretion in the award of $28,906.42 in fees to the former wife, and reverse in that respect.

*Id*. The trial court granted fees, in part, due to Jorge's lack of actual income, only imputed income. But, as is conceded, the amount of imputed income (here $200,000) is a factor in determining whether and how much attorney's fees to award. *See Freilich v. Freilich*, 897 So. 2d 537, 544 (Fla. 5th DCA 2005). In addition, the purpose of the award of attorney's fees in dissolution cases "is to ensure that both parties will have a similar ability to secure competent legal counsel," which both parties did in this case. *Lovell*, 14 So. 3d at 1117 (explaining the purpose of section 61.16, Florida Statutes, relating to the attorney's fees awards in dissolution cases). This case is unlike *Canakaris*, where a fee award "was proper to avoid an inequitable diminution of the fiscal sums granted the wife in these proceedings." 382 So. 2d at 1205. It is most closely analogous to *Lovell*, which requires reversal of the award of attorney's fees to Jorge.

AFFIRMED in part and REVERSED in part.

WALLIS and PRATT, JJ., concur.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____

8